FILED

## UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

2012 JUL 16 AM 9: 29

US DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO, FLORIDA

U.S. COMMODITY FUTURES              )
TRADING COMMISSION                  )
                                    )
            Plaintiff,              )
                                    )
v.                                  )
                                    )
ALTAMONT GLOBAL PARTNERS LLC,       )
JOHN G. WILKINS, PHILIP LEON, and   )
PAUL RANGEL,                        )
                                    )
            Defendants.             )
_____)

6:12-cv-1905-ORL-31TBJ
1095

## COMPLAINT FOR INJUNCTIVE RELIEF, CIVIL MONETARY
## PENALTIES AND OTHER EQUITABLE RELIEF

Plaintiff U.S. Commodity Futures Trading Commission (Commission) alleges as follows:

### I.     SUMMARY

1.     Since March 2009 and continuing until at least June 22, 2012, defendant Altamont

Global Partners LLC (AGP)—which is owned and operated by defendants Philip Leon (Leon),

Paul Rangel (Rangel), and John G. Wilkins (Wilkins)—solicited approximately $13 million from

approximately 198 participants in two investment pools operated by AGP: The McKinley Fund,

LLC (McKinley) and The Matterhorn Fund, LLC (Matterhorn) (together, Pools). The Pools

traded, among other things, commodity futures contracts (futures), options on futures (options),

and off-exchange foreign currency contracts (forex).

2.     On June 14, 2012, the National Futures Association (NFA) commenced an

unannounced audit of AGP. During its audit, NFA discovered serious irregularities with regard

to AGP's accounting and operations. Based on the NFA audit, on June 22, 2012, NFA instituted

1

S-2

a Member Responsibility Action (MRA) against AGP and an Associate Responsibility Action (ARA) against Wilkins (collectively, MRA/ARA). The MRA/ARA found, among other things, that AGP, Leon, Rangel, and Wilkins (collectively, defendants) misappropriated funds contributed by Matterhorn and McKinley pool participants to the Pools, that AGP and Wilkins sent false statements to McKinley and Matterhorn pool participants regarding their individual account earnings and balances, and that AGP and Wilkins provided false information and documentation to NFA.

3.     By virtue of this conduct, defendants have engaged, are engaging, or are about to engage in acts and practices that violate various antifraud provisions of the Commodity Exchange Act (Act), 7 U.S.C. §§ 1 *et seq.* (2006 & Supp. III 2009); the Act, as amended by the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010, Pub. L. No. 111-203, Title VII (the Wall Street Transparency and Accountability Act of 2010 (Dodd-Frank)), §§ 701-774, 124 Stat. 1376 (enacted July 21, 2010), to be codified at 7 U.S.C. §§ 1 *et seq.* (Act, as amended) and Commission Regulations (Regulations), 17 C.F.R. §§ 1 *et seq.* (2012).

4.     When Leon, Rangel, and Wilkins committed the acts, omissions, and failures described herein, each was acting within the scope of his agency, employment, and office with AGP; therefore, such acts, omissions, and failures are deemed to be those of AGP pursuant to Section 2(a)(1)(B) of the Act, 7 U.S.C. § 2(a)(1)(B) (2006), and Regulation 1.2, 17 C.F.R. § 1.2 (2012).

5.     On information and belief, at all times relevant to this Complaint, Leon, Rangel, and Wilkins controlled AGP, directly or indirectly, and did not act in good faith or knowingly induced, directly or indirectly, the acts of AGP described herein; therefore, Leon, Rangel, and

Wilkins are liable for the acts of AGP described herein pursuant to Section 13(b) of the Act, 7 U.S.C. § 13c(b) (2006).

6.    Accordingly, pursuant to Section 6c of the Act, as amended, to be codified at 7 U.S.C. § 13a-1, the Commission brings this action to permanently enjoin defendants' unlawful acts and practices and to compel their compliance with the Act, as amended, and Regulations and to further enjoin defendants from engaging in any commodity-related activity.  In addition, the Commission seeks civil monetary penalties and remedial ancillary relief, including, but not limited to, trading and registration bans, restitution, disgorgement, rescission, pre- and post-judgment interest, and other such relief as the Court may deem necessary and appropriate.

## II.    JURISDICTION AND VENUE

7.    The Court has jurisdiction over this action, pursuant to Section 6c(a) of the Act, as amended, to be codified at 7 U.S.C. § 13a-1(a), because it appears to the Commission that defendants have engaged, are engaging, or are about to engage in conduct that constitutes a violation of the Act; the Act, as amended; and the Regulations.

8.    Further, the Commission has jurisdiction over the forex transactions at issue in this Complaint pursuant to Section 2(c)(2) of the Act, 7 U.S.C. § 2(c)(2) (Supp. III 2009).

9.    Venue properly lies with this Court, pursuant to Section 6c(e) of the Act, as amended, to be codified at 7 U.S.C. § 13a-1(e), because at least some of the acts and practices in violation of the Act; the Act, as amended; and the Regulations have occurred within this District.

## III.    PARTIES

10.    Plaintiff U.S. Commodity Futures Trading Commission is an independent federal regulatory agency that is charged by Congress with the administration and enforcement of the

Act; the Act, as amended; and the Regulations promulgated thereunder. The CFTC maintains its principal office at Three Lafayette Centre, 1155 21st Street, NW, Washington, D.C. 20581.

11.     Defendant Altamont Global Partners LLC is a Florida limited liability company formed on March 30, 2009, with its principal place of business at 195 Wekiva Springs Road, Suite 350, Longwood, Florida 32779. At all times relevant to this Complaint, AGP has been and continues to be owned by Leon, Rangel, and Wilkins, each of whom has had and continues to have an approximate one-third ownership interest in AGP. AGP is engaged in a business that is of the nature of an investment trust, syndicate, or similar form of enterprise, and, in connection therewith, solicited, accepted, or received from others, funds, securities, or property for the purpose of trading in commodity interests, including agreements, contracts, or transactions in forex as described in Section 2(c)(2)(C)(i) of the Act, as amended, to be codified at 7 U.S.C. § 2(c)(2)(C)(i). AGP has been registered as a commodity pool operator (CPO) since November 2009. AGP has been registered with the NFA as a forex firm since November 2010.

12.     Defendant Philip Leon is a resident of Altamonte Springs, Florida and is a managing member and an owner of AGP. Leon oversees AGP's investments in and trading of, among other things, futures, options, and forex. In addition, Leon is a signatory on AGP's bank accounts. Leon has never been registered with the Commission in any capacity.

13.     Defendant Paul Rangel is a resident of Apopka, Florida and is a managing member and an owner of AGP. Rangel solicits funds from participants on behalf of the Pools and supervises AGP's sales force, which also solicits funds from participants on behalf of the Pools. Rangel has never been registered with the Commission in any capacity.

14.     Defendant John G. Wilkins is a resident of Chuluota, Florida and is a managing member and an owner of AGP. Since November 2009, Wilkins has been listed as a principal

4

and registered with NFA as an NFA associate member and the sole associated person (AP) of AGP. Wilkins is in charge of AGP's accounting and compliance. In addition, Wilkins is a signatory on AGP's bank accounts. Wilkins has been registered with NFA as the sole forex AP for AGP since November 2010.

## IV.    FACTS

**A.    Background Information Regarding AGP and the Pools It Operates**

15.    AGP is the CPO for at least four pools, two of which are the Matterhorn and McKinley Pools. AGP is also listed as the managing member of Matterhorn and McKinley in both of the Pools' respective Private Offering Memorandums (PPMs). In both PPMs, Leon is characterized as the fund manager, and the Pools tout Leon's 32 years of investment expertise and Stanford education. In the McKinley PPM, Wilkins is described as the Vice President of Operations, and it is noted that he "brings years of trading, back office, new account, transfer, and compliance expertise to help the Company's clients."

16.    From March 2009 to the present, Leon, Rangel, and Wilkins have shared and exercised responsibility and authority for AGP's everyday business and affairs.

17.    The Matterhorn pool was formed on March 3, 2009, and the McKinley pool was formed on January 1, 2011. Each pool was described as a "private investment vehicle for a limited number of sophisticated, long-term investors." AGP limited the participation in each pool to 99 pool participants.

18.    The Pools' PPMs stated that each pool would trade, among other things, futures, options, and other derivative securities. Each pool did trade, among other things, futures, options, and forex.

19.     The Pools' PPMs and Operating Agreements provided that AGP was entitled to certain compensation for its operation of the Pools.  In particular, AGP was entitled to 20% of the Pools' quarterly trading profits and to charge members in each of the Pools a 2% annual management fee.

20.     Between March 2009 and June 22, 2012, the Pools solicited and received approximately $13 million from approximately 198 pool participants for the purpose of investing in, among other things, futures, options, and forex.

21.     Rangel and the AGP salespersons he supervised received a 10% commission on all participant contributions to the Pools.  Upon information and belief, pool participants were never informed that 10% of their contributions to the Pools were paid to AGP salespersons as commissions.

**B.     Misappropriation of Pool Funds**

22.     Defendants misappropriated more than $5.2 million of Pool funds.

23.     Between March 2009 and May 2012, defendants caused the Pools to "loan" or "advance" approximately $5.2 million dollars to defendants through a series of transfers noted as "receivables to general partners" in the Pools' respective accounting ledgers.  These "loans" and "advances" were made without disclosure to the participants in the Pools, without authority under the PPMs and operating agreements of the Pools, and in violation of NFA regulations prohibiting such loans.

24.     The "loans" and "advances" to defendants were sham transactions designed to disguise defendants' misappropriation.  Upon information and belief, the loans to defendants from the Pools were either made without any form of interest payment obligation or were made with an interest obligation that was not enforced, and none of the loans was ever paid back.

25.     The "loans" and "advances" were used, among other things, to cover AGP's operating expenses; commission payments; travel, meals, and entertainment expenses; more than $140,000 in credit card payments for Leon's wife; and at least one loan AGP made to Leon.

26.     Some of these "loans" and "advances" were taken by defendants Leon, Rangel, and Wilkins in the form of cash or checks directly from the Pools.  Nothing in the PPMs permitted this.   Specifically, on a net basis, between 2009 and 2012, Leon took approximately $680,000 directly from Matterhorn and $3,250 directly from McKinley; Rangel took approximately $358,000 directly from Matterhorn; and Wilkins took approximately $192,000 directly from Matterhorn.

27.     In addition, other "loans" and "advances" were provided to AGP, which, in turn, made substantial cash or check payments to Leon, Rangel, and Wilkins.  Specifically, on a net basis, between 2010 and 2012, Leon took approximately $736,000 in such withdrawals from AGP; between 2011 and 2012, Rangel took approximately $257,000 in such withdrawals from AGP; and, between 2011 and 2012, Wilkins took approximately $511,000 in such withdrawals from AGP.

28.     In total, defendants used Pool funds to pay "loans" and "advances" of approximately $1,419,000 to Leon, $615,000 to Rangel, and $651,000 to Wilkins.

29.     To decrease its financial obligations to the Pools that were created by certain of these "loans" and "advances," AGP charged the Pools approximately $1.2 million in bogus management and performance fees, which, in turn, were credited against the "receivables to general partners" in the Pools' respective accounting ledgers.  Adding insult to the Pools' injuries, these management and performance fees were calculated based on falsely inflated asset values of the Pools and falsely inflated trading profits in the Pools (which, upon information and

7

belief, lost significant amounts trading). In actuality, because defendants appear to have been

engaging in a fraudulent scheme since inception of their operations in or about March 2009,

AGP was never entitled to any management or performance fees.

30.     AGP—by and through Leon, Rangel, Wilkins, and others—and Leon, Rangel,

and Wilkins individually engaged in the acts and practices described above knowingly or with

reckless disregard for the truth.

**C.      Defendants Issued False Account Statements to Pool Participants**

31.     Since the inception of the Pools, defendants issued regular quarterly statements to

McKinley and Matterhorn pool participants via U.S. mail and via the Internet through the Pools'

individual websites.

32.     As of the quarter ending March 31, 2012, AGP issued quarterly statements to pool

participants that, collectively, showed that the Matterhorn pool participants' interests were

approximately $10 million and the McKinley pool participants' interests were approximately

$6.5 million.

33.     The March 31, 2012 statements that defendants delivered to the Matterhorn and

McKinley pool participants were false in that they significantly overstated each pool participant's

interest in the pools. While the Matterhorn pool participants' collective interests purported to

total $10 million and the McKinley pool participants' interests purported to total $6.5 million,

the value of assets (in the form of cash and holdings at various brokerage firms) held by each

pool as of March 31, 2012 was approximately $1 million for Matterhorn and approximately $2.2

million for McKinley.

34.     In addition, the statements provided to pool participants did not disclose or otherwise reflect the impact of the approximately $5.2 million in purported loans and advances to AGP and its owners (Leon, Rangel, and Wilkins).

35.     Defendants represented to the Matterhorn pool participants historic returns of 27.23% for 2009, 33.80% for 2010, 20.75% for 2011, and 7.99% for January through May 2012.

36.     Defendants represented to McKinley pool participants historic returns of 23.16% for February through December 2011 and 8.04% for January through May 2012.

37.     Wilkins admitted to NFA staff, on or about June 21, 2012, that AGP had been providing falsely inflated quarterly statements to Matterhorn and McKinley pool participants since 2009.

38.     AGP—by and through Leon, Rangel, Wilkins, and others— and Leon, Rangel, and Wilkins individually engaged in the acts and practices described above knowingly or with reckless disregard for the truth.

**D.     AGP and Wilkins Provided False Information and Documents to NFA During NFA's Examination**

39.     NFA is registered with the Commission as a futures association pursuant to Section 17 of the Act, as amended, to be codified at 7 U.S.C. § 21.  NFA serves as a self-regulatory organization for the U.S. futures industry.  Under Commission oversight, NFA is responsible for certain aspects of the regulation of its member registrants.  NFA's responsibilities include conducting audits and examinations of its registrants, like AGP, to ensure compliance with NFA rules.

40.     On June 14, 2012, NFA began an unannounced examination of AGP.  In the course of NFA's examination, Wilkins knowingly made several oral and written false statements

to NFA to conceal the fact that the Pools' financial records had been falsified in order to hide defendants' trading losses and misappropriation of Pool funds.

41.     NFA staff requested that AGP provide documents that supported the numbers in the March 31, 2012 quarterly statements that the Pools sent to their respective pool participants. In response, Wilkins provided NFA with balance sheets stating that, as of March 31, 2012, Matterhorn had a purported net asset balance of $9.9 million and McKinley had a purported net asset balance of $6.5 million. Wilkins told NFA that each of the Pools' purported balances was comprised of futures, forex, and equities holdings at brokerage firms and of cash holdings at banks.

42.     The balance sheet for the Matterhorn pool also stated that it had approximately $7.3 million in investments "held at brokers" as of the quarter ending March 31, 2012.

43.     The Pools' balance sheets that AGP and Wilkins provided to NFA were false. NFA was unable to verify the existence of Pool assets sufficient to support the purported $9.9 million net asset balance at Matterhorn or the purported $6.5 million net asset balance at McKinley as of March 31, 2012.

44.     When NFA attempted to verify with Wilkins the $7.3 million investment balance "held at brokers," Wilkins eventually told NFA that those investments did not exist.

45.     For the period ending March 31, 2012, NFA determined that Matterhorn held approximately $1 million in assets and McKinley held approximately $2.2 million in assets.

46.     For these reasons, among others, NFA issued the MRA/ARA against AGP and Wilkins on June 22, 2012.

47.     The MRA/ARA, among other things:  (1) requires AGP and Wilkins to provide copies of the MRA/ARA to all participants in the three pools AGP operated (including Matterhorn and McKinley); (2) prohibits defendants from soliciting or accepting any additional funds from pool participants; and (3) prohibits defendants from disbursing or transferring any AGP or Pool funds over which they or any person acting on their behalf exercises control, without prior approval from NFA.

48.     On information and belief, AGP and Wilkins have failed to provide copies of the MRA/ARA to all participants in the three pools AGP operated (including Matterhorn and McKinley).

49.     AGP—by and through Wilkins—and Wilkins individually engaged in the acts and practices described above knowingly or with reckless disregard for the truth.

## V.     VIOLATION OF THE ACT; THE ACT, AS AMENDED; AND THE REGULATIONS

### COUNT ONE—FUTURES AND FOREX FRAUD

### Violations of Section 4b(a)(1) and (2)(A)-(C) of the Act, 7 U.S.C. § 6b(a)(1) & (2)(A)-(C)

### (All Defendants)

50.     The allegations set forth in paragraphs 1 to 49 are re-alleged and incorporated herein by reference.

51.     For conduct before July 16, 2011, Section 4b(a) of the Act, 7 U.S.C. § 6b(a) (Supp. III 2009), made it unlawful

> (1) for any person, in or in connection with any order to make, or the making of, any contract of sale of any commodity in interstate commerce or for future delivery that is made, or to be made, on or subject to the rules of a designated contract market, for or on behalf of any other person; or

11

(2) for any person, in or in connection with any order to make, or the making of, any contract of sale of any commodity for future delivery, or other agreement, contract, or transaction subject to paragraphs (1) and (2) of section 5a(g), that is made, or to be made, for or on behalf of, or with, any other person, other than on or subject to the rules of a designated contract market—

(A) to cheat or defraud or attempt to cheat or defraud the other person;

(B) willfully to make or cause to be made to the other person any false report or statement or willfully to enter or cause to be entered for the other person any false record;

(C) willfully to deceive or attempt to deceive the other person by any means whatsoever in regard to any order or contract or the disposition or execution of any order or contract, or in regard to any act of agency performed, with respect to any order or contract for or, in the case of paragraph (2), with the other person....

52. For conduct on or after July 16, 2011, Section 4b(a) of the Act, as amended, to be codified at 7 U.S.C. § 6b(a), makes it unlawful

(1) for any person, in or in connection with any order to make, or the making of, any contract of sale of any commodity in interstate commerce or for future delivery that is made, or to be made, on or subject to the rules of a designated contract market, for or on behalf of any other person; or

(2) for any person, in or in connection with any order to make, or the making of, any contract of sale of any commodity for future delivery, or swap, that is made, or to be made, for or on behalf of, or with, any other person, other than on or subject to the rules of a designated contract market—

(A) to cheat or defraud or attempt to cheat or defraud the other person;

(B) willfully to make or cause to be made to the other person any false report or statement or willfully to enter or cause to be entered for the other person any false record;

(C) willfully to deceive or attempt to deceive the other person by any means whatsoever in regard to any order or contract or the disposition or execution of any order or contract, or in regard to any act of

12

agency performed, with respect to any order or contract for or, in the case of paragraph (2), with the other person....

53. As described above, beginning in at least March 2009 and continuing to at least June 22, 2012, defendants violated Section 4b(a)(1) and (2)(A)-(C) of the Act, 7 U.S.C. § 6b(a)(1) & (2)(A)-(C) (Supp. III 2009), for conduct before July 16, 2011, and Section 4b(a)(1) and (2)(A)-(C) of the Act, as amended, to be codified at 7 U.S.C. § 6b(a)(1) & (2)(A)-(C), for conduct on or after July 16, 2011, in or in connection with futures and forex contracts made for, on behalf of, or with other persons, by misappropriating Pool funds and by providing McKinley and Matterhorn pool participants with false account statements that misrepresented the Pools' profitability and/or the value of pool participants' interests in the Pools.

54. Defendants engaged in the acts and practices described above knowingly or with reckless disregard for the truth.

55. When Leon, Rangel, and Wilkins committed the acts, omissions, and/or failures described above, they acted within the scope of their agency, employment, and office with AGP; therefore, such acts, omissions, and/or failures are deemed to those of AGP pursuant to Section 2(a)(1)(B) of the Act, 7 U.S.C. § 2(a)(1)(B) (2006), and Regulation 1.2, 17 C.F.R. § 1.21 (2012).

56. At all times relevant to this Count, Leon, Rangel, Wilkins controlled AGP, directly or indirectly, and did not act in good faith or knowingly induced, directly or indirectly, AGP's conduct alleged in this count. Therefore, pursuant to Section 13(b) of the Act, 7 U.S.C. § 13c(b) (2006), Leon, Rangel, and Wilkins are liable for AGP's violations of Section 4b(a)(1) and (2)(A)-(C) of the Act, 7 U.S.C. § 6b(a)(1) & (2)(A)-(C) (Supp. III 2009), for conduct before July 16, 2011, and Section 4b(a)(1) and (2)(A)-(C) of the Act, as amended, to be codified at 7 U.S.C. § 6b(a)(1) & (2)(A)-(C), for conduct on or after July 16, 2011.

13

57.     Each act of misappropriation and issuance of a false report or account statement, including but not limited to those specifically alleged herein, is alleged as a separate and distinct violation of Section 4b(a)(1) and (2)(A)-(C) of the Act, 7 U.S.C. § 6b(a)(1) & (2)(A)-(C) (Supp. III 2009), for conduct before July 16, 2011, and Section 4b(a)(1) and (2)(A)-(C) of the Act, as amended, to be codified at 7 U.S.C. § 6b(a)(1) & (2)(A)-(C), for conduct on or after July 16, 2011.

## COUNT TWO—FRAUD BY COMMODITY POOL OPERATOR AND ASSOCIATED PERSONS

### Violations of Section 4o(1) of the Act, 7 U.S.C. § 6o(1)

### (All Defendants)

58.     The allegations set forth in paragraphs 1 to 57 are re-alleged and incorporated herein by reference.

59.     Prior to July 16, 2011, a CPO was defined in Section 1a(5) of the Act, 7 U.S.C. § 1a(5) (2006), as any firm or individual "engaged in a business that is of the nature of an investment trust, syndicate, or similar form of enterprise, and who, in connection therewith, solicits, accepts or receives from others, funds, securities, or property, either directly or through capital contributions, the sale of stock or other forms of securities, or otherwise, for the purpose of trading in any commodity for future delivery on or subject to the rules of any contract market."

60.     As of July 16, 2011, Section 1a(11)(A)(i) of the Act, as amended, to be codified at 7 U.S.C. § 1a(11)(A)(i), defines a CPO as a person:

> engaged in a business that is of the nature of a commodity pool, investment trust, syndicate , or similar form of enterprise, and who, in connection therewith, solicits, accepts, or receives from others, funds ... for the purpose of trading in commodity interests, including any—

14

(I)  commodity for future delivery...;
(II)  agreement, contract, or transaction described in Section
2(c)(2)(C)(i) or Section 2(c)(2)(D)(i); [or]
(III)  commodity option authorized under section 4c."

61.  Regulation 1.3(aa), 17 C.F.R. § 1.3(aa), defines an AP of a CPO as "any natural

person who is associated in any of the following capacities with . . . (3) A commodity pool

operator as a partner, officer, employee, consultant, or agent (or any natural person occupying a

similar status or performing similar functions), in any capacity which involves (i) the solicitation

of funds, securities, or property for participation in a commodity pool or (ii) the supervision of

any person or persons so engaged."

62.  Section 4o of the Act, 7 U.S.C. § 6o (2006), makes it unlawful for a "commodity

pool operator, or associated person of a commodity pool operator by use of the mails or any

means or instrumentality of interstate commerce, directly or indirectly—

(A)  to employ any device, scheme, or artifice to defraud any client or
participant or prospective client or participant; or

(B)  to engage in any transaction, practice, or course of business which
operates as a fraud or deceit upon any client or participant or prospective
client or participant.

63.  Beginning in at least March 2009 and continuing to at least June 22, 2012, AGP

has been operating as a CPO in that it engaged in a business that is of the nature of an investment

trust, syndicate or similar form of enterprise, and in connection therewith, solicited, accepted, or

received funds, securities, or property from others for the purpose of trading futures, options, and

forex.

64.  Since at least November 2009, Wilkins and Rangel have acted as APs of AGP.

65.  Beginning in at least March 2009 and continuing to at least June 22, 2012, AGP

acting as a CPO, and Wilkins and Rangel directly, through the use of the mails or other means or

15

instrumentalities of interstate commerce (including through use of U.S. mail to pool participants and the Internet), have violated Section 4$\underline{o}$ of the Act, 7 U.S.C. § 6$\underline{o}$ (2006), by misappropriating Pool funds and by providing pool participants with false account statements that misrepresented the profitability of the Matterhorn and McKinley pools and the value of pool participants' interests in each of those Pools.

66.     Defendants engaged in the acts and practices described above knowingly or with reckless disregard for the truth.

67.     When Leon, Rangel, and Wilkins committed the acts, omissions, and/or failures described above, they acted within the scope of their agency, employment, and office with AGP; therefore, such acts, omissions, and/or failures are deemed to those of AGP pursuant to Section 2(a)(1)(B) of the Act, 7 U.S.C. § 2(a)(1)(B) (2006), and Regulation 1.2, 17 C.F.R. § 1.21 (2012).

68.     At all times relevant to this Complaint, Leon, Rangel, and Wilkins controlled AGP, directly or indirectly, and did not act in good faith or knowingly induced, directly or indirectly, AGP's conduct alleged in this count. Therefore, Leon, Rangel, and Wilkins are liable for AGP's violations of Section 4$\underline{o}$ of the Act, 7 U.S.C. § 6$\underline{o}$, pursuant to Section 13(b) of the Act, 7 U.S.C. § 13c(b).

69.     Each misappropriation, issuance of a false report or account statement, and misrepresentation or omission of material fact, including but not limited to those specifically alleged herein, is alleged as a separate and distinct violation of Section 4$\underline{o}$ of the Act, 7 U.S.C. § 6$\underline{o}$.

## COUNT THREE—FRAUD IN CONNECTION WITH OFF-EXCHANGE FOREX TRANSACTIONS

### Violations of Regulation 5.2(b)(1)-(3), 17 C.F.R. § 5.2(b)(1)-(3)

### (All Defendants)

70.     The allegations set forth in paragraphs 1 to 69 are re-alleged and incorporated herein by reference.

71.     Since October 18, 2010, Regulation 5.2(b)(1)-(3), 17 C.F.R. § 5.2(b)(1)-(3) (2012), has made it unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce, directly or indirectly, in or in connection with any retail forex transaction: (1) to cheat or defraud or attempt to cheat or defraud any person; (2) willfully to make or cause to be made to any person any false report or statement or cause to be entered for any person any false record; or (3) willfully to deceive or attempt to deceive any person whatsoever.

72.     Since at least March 2009, defendants have solicited and received money from pool participants for the purpose of, among other things, entering into retail forex transactions as defined in Regulation 5.1(m), 17 C.F.R. § 5.1(m) (2012).

73.     In connection with their solicitation and receipt of money from pool participants for the purpose of entering into retail forex transactions, since at least October 18, 2010, defendants through the use of the mails or other means or instrumentalities of interstate commerce (including through the use of U.S. mail and the Internet) have violated Regulation 5.2(b)(1)-(3), 17 C.F.R. § 5.2(b)(1)-(3) (2012), by misappropriating Pool funds and by providing pool participants with false account statements that misrepresented the profitability of the Matterhorn and McKinley pools and the value of pool participants' interests in each of those Pools.

74.     Defendants engaged in the acts and practices described above knowingly or with reckless disregard for the truth.

75.     When Leon, Rangel, and Wilkins committed the acts, omissions, and/or failures described above, they acted within the scope of their agency, employment, and office with AGP; therefore, such acts, omissions, and/or failures are deemed to those of AGP pursuant to Section 2(a)(1)(B) of the Act, 7 U.S.C. § 2(a)(1)(B) (2006), and Regulation 1.2, 17 C.F.R. § 1.21 (2012).

76.     At all times relevant to this Count, Leon, Rangel, and Wilkins controlled AGP, directly or indirectly, and did not act in good faith or knowingly induced, directly or indirectly, AGP's conduct alleged in this count.  Therefore, Leon, Rangel, and Wilkins are liable for AGP's violations of Regulation 5.2(b)(1)-(3), 17 C.F.R. § 5.2(b)(1)-(3), pursuant to Section 13(b) of the Act, 7 U.S.C. § 13c(b).

77.     Each misappropriation, issuance of a false report or account statement, and misrepresentation or omission of material fact, including but not limited to those specifically alleged herein, is alleged as a separate and distinct violation of Regulation 5.2(b)(1)-(3), 17 C.F.R. § 5.2(b)(1)-(3).

## COUNT FOUR—FRAUD IN DEALINGS WITH NFA

### Violations of Section 9(a)(4) of the Act, as amended, to be codified at 7 U.S.C. § 13(a)(4)

### (AGP and Wilkins)

78.     The allegations set forth in paragraphs 1 to 77 are re-alleged and incorporated herein by reference.

79.     Section 9(a)(4) of the Act, as amended, to be codified at 7 U.S.C § 13(a)(4), makes it unlawful for "[a]ny person willfully to falsify, conceal, or cover up by any trick, scheme, or artifice a material fact, make any false, fictitious, or fraudulent statements or

representations, or make or use any false writing or document knowing the same to contain any false, fictitious, or fraudulent statement or entry to a registered entity, board of trade, swap data repository, or futures association designated or registered under this Act acting in furtherance of its official duties under this Act."

80.    NFA is a futures association organized and registered with the Commission pursuant to Section 17 of the Act that was acting in furtherance of its official duties when it conducted the June 2012 examination of AGP.

81.    As described above, AGP, by and through Wilkins, made numerous misrepresentations and provided multiple false documents to NFA, during its June 2012 examination of AGP, including but not limited to balance sheets and other documents for the Pools that falsified the Pools' values in order to conceal the true value of the Pools.

82.    When Wilkins committed the acts, omissions, and/or failures described above, he acted within the scope of his agency, employment, and office with AGP; therefore, such acts, omissions, and/or failures are deemed to those of AGP pursuant to Section 2(a)(1)(B) of the Act, 7 U.S.C. § 2(a)(1)(B) (2006), and Regulation 1.2, 17 C.F.R. § 1.21 (2012).

83.    Each misrepresentation, false statement, omission of material fact, and act of concealment made by defendants to NFA, including but not limited to those specifically alleged herein, is alleged as a separate and distinct violation of Section 9(a)(4) of the Act, as amended, to be codified at 7 U.S.C. § 13(a)(4).

## RELIEF REQUESTED

WHEREFORE, the Commission respectfully requests that the Court, as authorized by Section 6c of the Act, as amended, to be codified at 7 U.S.C. §13a-1, and pursuant to its own equitable powers, enter:

19

A.      An order finding that defendants are liable for violating Section 4b(a)(1) and

(2)(A)-(C) of the Act, 7 U.S.C. § 6b(a)(1) & (2)(A)-(C) (Supp. III 2009), with respect to conduct

before July 16, 2011; finding that defendants are liable for violating Section 4b(a)(1) and (2)(A)-

(C) of the Act, as amended, to be codified at 7 U.S.C. § 6b(a)(1) & (2)(A)-(C), with respect to

conduct on or after July 16, 2011; finding that defendants are liable for violating Section 4o of

the Act, 7. U.S.C. § 6o (2006); finding that defendants are liable for violating Regulation

5.2(b)(1)-(3), 17 C.F.R. § 5.2(b)(1)-(3); and finding that AGP and Wilkins are liable for violating

Section 9(a)(4) of the Act, 7 U.S.C. § 13(a)(4).

B.      An order of permanent injunction prohibiting defendants, and any other person or

entity associated with defendants, from engaging in conduct that violates Section 4b(a)(1) and

(2)(A)-(C) of the Act, as amended, to be codified at 7 U.S.C. § 6b(a)(1) & (2)(A)-(C); Section 4o

of the Act, 7 U.S.C. § 6o (2006); and Regulation 5.2(b)(1)-(3), 17 C.F.R. § 5.2(b)(1)-(3).

C.      An order of permanent injunction prohibiting AGP and Wilkins, and any other

person or entity associated with AGP and Wilkins, from engaging in conduct that violates

Section 9(a)(4) of the Act, as amended, to be codified at 7 U.S.C. § 13(a)(4).

D.      An order of permanent injunction restraining, enjoining, and prohibiting

defendants from directly or indirectly:

1.  Trading on or subject to the rules of any registered entity (as that term is
    defined in Section 1a of the Act, as amended, 7 U.S.C. § 1a);

2.  Entering into any transactions involving commodity futures, options on
    commodity futures, commodity options (as that term is defined in Regulation 1.3
    (hh), 17 C.F.R. § 1.3(hh) (2012)) ("commodity options"), security futures
    products, and/or foreign currency (as described in Sections 2(c)(2)(B) and
    2(c)(2)(C)(i) of the Act, as amended, 7 U.S.C. §§ 2(c)(2)(B) and 2(c)(2)(C)(i))
    ("forex contracts") for their own personal account or for any account in which
    they have a direct or indirect interest;

3.  Having any commodity futures, options on commodity futures, commodity
    options, security futures products, and/or forex contracts traded on their behalf;

20

4. Controlling or directing the trading for or on behalf of any other person or entity, whether by power of attorney or otherwise, in any account involving commodity futures, options on commodity futures, commodity options, security futures products, and/or forex contracts;

5. Soliciting, receiving or accepting any funds from any person for the purpose of purchasing or selling any commodity futures, options on commodity futures, commodity options, security futures products, and/or forex contracts;

6. Applying for registration or claiming exemption from registration with the Commission in any capacity, and engaging in any activity requiring such registration or exemption from registration with the Commission, except as provided for in Regulation 4.14(a)(9), 17 C.F.R. § 4.14(a)(9) (2012); and/or

7. Acting as a principal (as that term is defined in Regulation 3.1(a), 17 C.F.R. § 3.1(a) (2012)), agent or any other officer or employee of any person (as that term is defined in Section 1a of the Act, as amended, 7 U.S.C. § 1a) registered, exempted from registration or required to be registered with the Commission except as provided for in Regulation 4.14(a)(9), 17 C.F.R. § 4.14(a)(9) (2012).

E.    An order directing defendants, as well as any successors to any defendant, to disgorge, pursuant to such procedure as the Court may order, all benefits received from the acts or practices which constitute violations of the Act; the Act, as amended, and the Regulations, as described herein, and pre- and post- judgment interest thereon from the date of such violations;

F.    An order directing the defendants, as well as any successors to any defendant, to rescind, pursuant to such procedures as the Court may order, all contracts and agreements, whether implied or express, entered into between, with, or among defendants and any of the pool participants whose funds were received by defendants as a result of the acts and practices which constituted violations of the Act; the Act, as amended, and the Regulations, as described herein;

G.    An order requiring defendants to make full restitution to every person or entity whose funds defendants received or caused another person or entity to receive, from the acts or practices that constitute violations of the Act; the Act, as amended, and the Regulations, as described herein, and pre- and post- judgment interest thereon from the date of such violations;

21

H.     An order requiring defendants to pay civil monetary penalties, to be assessed by the Court, in amounts of not more than the higher of: (1) triple the monetary gain to each defendant for each violation of the Act; the Act, as amended, and the Regulations; or (2) a penalty of $140,000 for each violation committed;

I.     An order requiring defendants to pay costs and fees, as permitted by 28 U.S.C. §§ 1920 and 2412(a)(2) (2006); and

J.     An order providing such other and further relief as this Court may deem necessary and appropriate under the circumstances.

Respectfully submitted by,

Charles D. Marvine
Missouri Bar No. 44906
Rachel Hayes
Missouri Bar No. 44906
Peter Riggs
Missouri Bar No. 57268
U.S. Commodity Futures Trading
Commission
Division of Enforcement
4900 Main Street, Suite 500
Kansas City, MO 64112
816-960-7743 (Marvine)
816-960-7741 (Hayes)
816-960-7748 (Riggs)
816-960-7754 (fax)
cmarvine@cftc.gov
rhayes@cftc.gov
priggs@cftc.gov

22