UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

U.S. COMMODITY FUTURES TRADING
COMMISSION,

      Plaintiff,

v.                                     Case No:   6:12-cv-1095-Orl-31TBS

ALTAMONT GLOBAL PARTNERS, LLC,
JOHN G. WILKINS, PHILIP LEON and
PAUL RANGEL,

      Defendants.

_____

## REPORT AND RECOMMENDATION

Pending before the Court is Plaintiff Commodity Futures Trading Commission's ("CFTC") Motion and Brief in Support of Motion for Entry of Default Judgment, Permanent Injunction, Civil Monetary Penalty and Ancillary Equitable Relief against Defendants Altamont Global Partners LLC ("AGP") and John G. Wilkins ("Wilkins").   (Doc. 94).   For the reasons that follow, I respectfully recommend that the Court grant CFTC's motion.

### I. Procedural History[1]

On July 16, 2012, CFTC filed its complaint against Defendants AGP, Wilkins, Philip Leon ("Leon") and Paul Rangel ("Rangel") seeking injunctive and other equitable relief, as well as the imposition of civil penalties, for violations of the Commodity Exchange Act ("Act"), 7 U.S.C. §§ 1, et seq. (2006 & Supp. III  2009); the Act, as amended by the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010,

_____

[1] Unless otherwise stated, all facts are repeated from CFTC's complaint (Doc. 2).

Pub. L. No. 111-203, Title VII (the Wall Street Transparency and Accountability Act of 2010 ("Dodd-Frank")), §§ 701-774, 124 Stat. 1376 (enacted July 21,  2010), 7 U.S.C. §§ 1 et seq. (2012) (Act, as amended) and Commission Regulations ("Regulations"), 17 C.F.R. §§ 1 et seq. (2012).

The Court entered an ex parte statutory restraining order against Defendants on July 16, 2012 and a Consent Order for Preliminary Injunction against them on August 17, 2012.   (Doc. 8).   In Orders dated October 2 and 15, 2012, the Court appointed Florida attorney Mark V. Silverio as Receiver for Defendants and others, including AGP investment pools named The Matterhorn LLC ("Matterhorn"), The McKinley Fund, LLC ("McKinley"), Midas Management Partners LLC ("MMP"), and Binary Strategy One Fund, LLC ("Binary") (collectively, the "Receivership Entities") (Matterhorn, McKinley, MMP and Binary are referred to collectively as the "AGP Pools").   (Docs. 50, 58).

Beginning in approximately March of 2009 and continuing through at least June 22, 2012, Defendants orchestrated a fraudulent scheme, which induced approximately 240 participants to invest approximately $18 million in the AGP Pools operated by Defendants, in violation of the Act and Regulations.   (¶¶ 53, 65, 73, 81).   The CFTC's complaint seeks to enjoin Defendants' unlawful acts and practices and to compel compliance with the Act and Regulations.   The complaint also seeks restitution, disgorgement, civil monetary penalties, and other ancillary equitable relief.

On July 17, 2012, the complaint was served on AGP and Wilkins.   (Doc. 9-10). Pursuant to Fed. R. Civ. P. 12(a)(1)(A)(i), their responses were due on or before August 7, 2012.   These Defendants did not respond to the complaint and on August 22, 2012,

the CFTC applied for Clerk's defaults which were entered against AGP and Wilkins on August 23, 2012.   (Docs. 32, 34-35).

On July 19, 2013, the United States charged Wilkins with attempt and conspiracy to commit mail fraud.   U.S. v. Wilkins, Case No. 6:13-cr-181-22DAB.   He entered a plea of guilty and is awaiting sentencing.   Id., Doc. 5.   According to Wilkins' plea agreement, the total amount Defendants unlawfully obtained from investors, less amounts paid back to investors is $16,805,047.81.   Id., p. 3.   The Court in the criminal case entered a forfeiture money judgment against Wilkins in the amount of $18,323,914.87.   Id., Doc. 24.

On December 17, 2013, the Court entered Consent Orders for permanent injunctions, civil monetary penalties, and other equitable relief against Leon and Rangel. (Doc. 91-92).   Pursuant to Federal Rule of Civil Procedure 55(b)(2), the CFTC has filed the instant motion for entry of default judgment, a permanent injunction, civil monetary penalties, and equitable relief against AGP and Wilkins.

## II. Statement of Facts

CFTC is an independent  federal regulatory agency charged by Congress with administering and enforcing the Act, 7 U.S.C. §§ 1, et seq. (2006 & Supp. III 2009); the Act, as amended 7 U.S.C. §§ 1 et seq. (2012); and the Regulations, 17 C.F.R. §§ 1.1, et seq. (2013).   (¶ 10).

AGP is a Florida limited liability company, formed on March 30, 2009, with its principal place of business at 195 Wekiva Springs Road, Suite 350, Longwood, Florida 32779.   AGP has been and continues to be owned by Leon, Rangel, and Wilkins, each of whom has had and continues to have an approximate one-third ownership interest in AGP.   AGP engaged in a business that is of the nature of an

- 3 -

investment trust, syndicate, or similar form of enterprise, and, in connection therewith, solicited, accepted, or received from others, funds, securities, or property for the purpose of trading in commodity interests, including agreements, contracts, or transactions in forex as described in Section 2(c)(2)(C)(i) of the Act, as amended, to be codified at 7 U.S.C. §2(c)(2)(C)(i).   AGP has been registered as a commodity pool operator since November 2009.  AGP has been registered with the National Futures Association ("NFA") as a forex firm since November 2010. (¶ 11).

Leon was a resident of Altamonte Springs, Florida and a managing member and an owner of AGP.  Leon oversaw AGP's investments in and trading of, among other things, futures, options, and forex.  In addition, Leon was a signatory on AGP's bank accounts.  Leon has never been registered with the CFTC in any capacity. (¶ 12).

Rangel was a resident of Apopka, Florida and was a managing member and an owner of AGP.  Rangel solicited funds from participants on behalf of AGP and supervised AGP's sales force, which also solicited funds from participants on behalf of AGP.  Rangel has never been registered with the CFTC in any capacity.   (¶ 13).

Wilkins was a resident of Chuluota, Florida and was a managing member and an owner of AGP.  Since November 2009, Wilkins was listed as a principal and registered with NFA as an NFA associate member and the sole associated person of AGP.  Wilkins was in charge of AGP's accounting and compliance.   He was also a signatory on AGP's bank accounts.  Wilkins was registered with NFA as the sole forex associated person for AGP since November 2010. (¶ 14).

AGP was the commodity pool operator for McKinley and Matterhorn.   AGP was also listed as the managing member of McKinley and Matterhorn in those entities' respective private offering memorandums.   In both private offering memorandums, Leon is characterized as the fund manager, and the pools tout his 32 years of investment expertise and Stanford education.   In the McKinley private offering memorandum, Wilkins is described as the Vice President of Operations, and it is noted that he "brings years of trading, back office, new account, transfer, and compliance expertise to help the Company's clients." (¶ 15).

Since March 2009 and continuing until at least June 22, 2012, AGP was owned and operated by Leon, Rangel, and Wilkins.   These Defendants solicited approximately $13 million from approximately 198 participants in the McKinley and Matterhorn pools.   These pools traded, among other things, commodity futures contracts, options on futures, and off-exchange foreign currency contracts. (¶ 1).

The National Futures Association ("NFA") is registered with the CFTC as a futures association pursuant to Section 17 of the Act, as amended, to be codified at 7 U .S.C. § 21.  NFA serves as a self-regulatory organization for the U.S. futures industry. Under CFTC oversight, NFA is responsible for certain aspects of the regulation of its member registrants.   NFA's responsibilities include conducting audits and examinations of its registrants, like AGP, to ensure compliance with NFA rules.   (¶ 39).

On June 14, 2012, the NFA commenced an unannounced audit of AGP.   During the audit, NFA discovered serious irregularities with regard to AGP's accounting and operations.   Based on the audit, on June 22, 2012, NFA instituted a Member Responsibility Action (MRA) against AGP and an Associate Responsibility Action

(ARA) against Wilkins (collectively the "MRA/ARA").   The MRA/ARA found that AGP, Leon, Rangel, and Wilkins misappropriated funds contributed by Matterhorn and McKinley pool participants to those pools, that AGP and Wilkins sent false statements to McKinley and Matterhorn pool participants regarding their individual account earnings and balances, and that AGP and Wilkins provided false information and documentation to NFA.   (¶ 2).

When Leon, Rangel, and Wilkins committed the acts, omissions, and failures alleged in the complaint, each was acting within the scope of his agency, employment, and office with AGP. (¶ 4).

Leon, Rangel, and Wilkins controlled AGP, directly or indirectly, and did not act in good faith or knowingly induced, directly or indirectly, the acts of AGP described in the complaint.   (¶ 5).

From March 2009 to the filing of the complaint, Leon, Rangel, and Wilkins shared and exercised responsibility and authority for AGP's everyday business and affairs. (¶ 16).

The Matterhorn pool was formed on March 3, 2009, and the McKinley pool was formed on January 1, 2011.  Each pool was described as a "private investment vehicle for a limited number of sophisticated, long-term investors." AGP limited the participation in each pool to 99 pool participants.   (¶ 17).

The private placement memorandums for the Matterhorn and McKinley pools stated that each pool would trade, among other things, futures, options, and other derivative securities.  Each pool did trade, among other things, futures, options, and forex.   (¶ 18).

The Matterhorn and McKinley pool private placement memorandums and operating agreements provided that AGP was entitled to certain compensation for its operation of those pools.  In particular, AGP was entitled to 20% of each pools' quarterly trading profits and to charge members in each of the pools a 2% annual management fee.  (¶ 19).

Between March 2009 and June 22, 2012, the Matterhorn and McKinley pools solicited and received approximately $13 million from approximately 198 pool participants for the purpose of investing in, among other things, futures, options, and forex.  (¶ 20).

Rangel and the AGP salespersons he supervised received a 10% commission on all participant contributions to the Matterhorn and McKinley pools.   Pool participants were never informed that 10% of their contributions to these pools were paid to AGP salespersons as commissions.   (¶ 21).

Defendants misappropriated more than $5.2 million of Matterhorn and McKinley pool funds.  (¶ 22).

Between March 2009 and May 2012, Defendants caused the Matterhorn and McKinley pools to "loan" or "advance" approximately $5.2 million dollars to Defendants through a series of transfers noted as "receivables to general partners" in the pools' respective accounting ledgers.   These "loans" and "advances" were made without disclosure to the participants in the Matterhorn and McKinley pools, without authority under the private placement memorandums and operating agreements of the pools, and in violation of NFA regulations prohibiting such loans.  (¶ 23).

The "loans" and "advances" to Defendants were sham transactions designed to disguise Defendants' misappropriation.   The loans to Defendants from the Matterhorn and

McKinley pools were either made without any form of interest payment obligation or were made with an interest obligation that was not enforced, and none of the loans was ever paid back.   (¶ 24).

The "loans" and "advances" were used, among other things, to cover AGP's operating expenses; commission payments; travel, meals, and entertainment expenses; more than $140,000 in credit card payments for Leon's wife; and at least one loan AGP made to Leon.   (¶ 25).

Some of these "loans" and "advances" were taken by Leon, Rangel, and Wilkins in the form of cash or checks directly from the Matterhorn and McKinley pools. Nothing in the private placement memorandums permitted this.   On a net basis, between 2009 and 2012, Leon took approximately $680,000 directly from Matterhorn and $3,250 directly from McKinley; Rangel took approximately $358,000 directly from Matterhorn; and Wilkins took approximately $192,000 directly from Matterhorn.   (¶ 26).

Other "loans" and "advances" were provided to AGP, which in turn, made substantial cash or check payments to Leon, Rangel, and Wilkins.   On a net basis, between 2010 and 2012, Leon took approximately $736,000 in such withdrawals from AGP; between 2011 and 2012, Rangel took approximately $257,000 in such withdrawals from AGP; and, between 2011 and 2012, Wilkins took approximately $511,000 in such withdrawals from AGP.   (¶ 27).

In total, Defendants used Matterhorn and McKinley pool funds to pay "loans" and "advances" of approximately $1,419,000 to Leon, $615,00P to Rangel, and $651,000 to Wilkins.   (¶ 28).

To decrease its financial obligations to the Matterhorn and McKinley pools that were created by certain of these "loans" and "advances," AGP charged the pools approximately $1.2 million in bogus management and performance fees, which in turn, were credited against the "receivables to general partners" in the Matterhorn and McKinley pools' respective accounting ledgers.   These management and performance fees were calculated based on falsely inflated asset values of the Matterhorn and McKinley pools and falsely inflated trading profits in those pools, which lost significant amounts trading.  In actuality, because Defendants appear to have been engaging in a fraudulent scheme since inception of their operations in or about March 2009, AGP was never entitled to any management or performance fees.   (¶ 29).

AGP-by and through Leon, Rangel, Wilkins, and others-and Leon, Rangel, and Wilkins individually engaged in the acts and practices described above knowingly or with reckless disregard for the truth.   (¶ 30).

Since the inception of the Matterhorn and McKinley pools, Defendants issued regular quarterly statements to McKinley and Matterhorn pool participants via U.S. mail and via the Internet through the pools' individual websites.   (¶ 31).

As of the quarter ending March 31, 2012, AGP issued quarterly statements to pool participants that, collectively, showed that the Matterhorn pool participants' interests were approximately $10 million and the McKinley pool participants' interests were approximately $6.5 million.   (¶ 32).

The March 31, 2012 statements that Defendants delivered to the Matterhorn and McKinley pool participants were false in that they significantly overstated each pool participant's interest in the pools.   While the Matterhorn pool participants' collective

interests purported to total $10 million and the McKinley pool participants' interests purported to total $6.5 million, the value of assets (in the form of cash and holdings at various brokerage firms) held by each pool as of March 31, 2012 was approximately $1 million for Matterhorn and approximately $2.2 million for McKinley.   (¶ 33).

The statements provided to pool participants did not disclose or otherwise reflect the impact of the approximately $5.2 million in purported loans and advances to AGP and its owners (Leon, Rangel, and Wilkins).   (¶ 34).

Defendants represented to the Matterhorn pool participants historic returns of 27.23% for 2009, 33.80% for 2010, 20.75% for 2011, and 7.99% for January through May 2012.   (¶ 35).   Defendants represented to McKinley pool participants historic returns of 23.16% for February through December 2011 and 8.04% for January through May 2012. (¶ 36).

Wilkins admitted to NFA staff, on or about June 21, 2012, that AGP had been providing falsely inflated quarterly statements to Matterhorn and McKinley pool participants since 2009.   (¶ 37).

AGP-by and through Leon, Rangel, Wilkins, and others-and Leon, Rangel, and Wilkins individually engaged in the acts and practices described above knowingly or with reckless disregard for the truth.   (¶ 38).

In the course of NFA's examination begun June 14, 2012, Wilkins knowingly made several oral and written false statements to NFA to conceal the fact that the Matterhorn and McKinley pools' financial records had been falsified in order to hide Defendants' trading losses and misappropriation of pool funds.   (¶ 40).

NFA staff requested that AGP provide documents that supported the numbers in the March 31, 2012 quarterly statements that the Matterhorn and McKinley pools sent to their respective pool participants.   In response, Wilkins provided NFA with balance sheets stating that, as of March 31, 2012, Matterhorn had a purported net asset balance of $9.9 million and McKinley had a purported net asset balance of $6.5 million.   Wilkins told NFA that each of the pools' purported balances was comprised of futures, forex, and equities holdings at brokerage firms and of cash holdings at banks.   (¶ 41).

The balance sheet for the Matterhorn pool also stated that it had approximately $7.3 million in investments "held at brokers" as of the quarter ending March 31, 2012. (¶ 42).

The Matterhorn and McKinley pools' balance sheets that AGP and Wilkins provided to NFA were false.   NFA was unable to verify the existence of pool assets sufficient to support the purported $9.9 million net asset balance at Matterhorn or the purported $6.5 million net asset balance at McKinley as of March 31, 2012.   (¶ 43).

When NFA attempted to verify with Wilkins the $7.3 million investment balance "held at brokers," Wilkins eventually told NFA that those investments did not exist.   (¶ 44).

For the period ending March 31, 2012, NFA determined that Matterhorn held approximately $1 million in assets and McKinley held approximately $2.2 million in assets.   (¶ 45).

For these reasons, among others, NFA issued the MRA/ARA against AGP and Wilkins on June 22, 2012.   (¶ 46).

The MRA/ARA, among other things: (1) requires AGP and Wilkins to provide copies of the MRA/ARA to all participants in the three pools AGP operated (including Matterhorn and McKinley); (2) prohibits Defendants from soliciting or accepting any additional funds from pool participants; and (3) prohibits Defendants from disbursing or transferring any AGP or Pool funds over which they or any person acting on their behalf exercises control, without prior approval from NFA.   (¶ 47).

AGP and Wilkins failed to provide copies of the MRA/ARA to all participants in the three pools AGP operated (including Matterhorn and McKinley).   (¶ 48).

AGP-by and through Wilkins-and Wilkins individually engaged in the acts and practices described above knowingly or with reckless disregard for the truth.   (¶ 49).

### III. Discussion

CFTC's served its complaint on AGP and Wilkins on July 17, 2012.   Service is proper if it is made, as was done in this case, on a corporation's general manager. FED. R. CIV. P. 4(h)(1), (e)(1).[2] Pursuant to Federal Rule of Civil Procedure 12(a)(1), AGP and Wilkins were required to respond to CFTC's complaint within twenty-one (21) days from the date of service.   AGP and Wilkins failed to respond and have otherwise failed to appear in this action.   The federal rules require court clerks to enter a defendant's default "[w]hen service of process is properly effected, but the served party fails to respond in a

---

[2] The federal rules provide that service can be made by any manner accepted in the state or "by delivering a copy of the summons and of the complaint to an officer, a managing or general agent, or any other agent authorized by appointment or by law to receive service of process[.]" FED. R. CIV. P. 4(h)(1), (e)(1). Defendant AGP is a Florida corporation. (Doc. 1). In the state of Florida, "[a] corporation may be served by serving process on the president, vice president, the cashier, treasurer, secretary, general manager, any director, any officer or business agent residing in the state. As an alternative, process may be served on the agent designated by the corporation as its registered agent." Mid-Continent Cas. Co. v. Harbor Springs Constr., Case No. 2:10-cv-330-Ftm-29SPC, 2010 U.S. Dist. LEXIS 92412, at *2 (M.D. Fla. Aug. 26, 2010) (citing FLA. STAT. § 48.081(1)(a-d), (3)(a)).

timely manner . . ." <u>Kelly v. Florida</u>, 233 F. App'x 883, 885 (11th Cir. 2007) (citing FED. R. CIV. P. 55(a)).   Accordingly, the Clerk properly entered defaults against both AGP and Wilkins.

"A defendant, by his default, admits the plaintiff's well-pleaded allegations of fact, is concluded on those facts by the judgment, and is barred from contesting on appeal the facts thus established."   <u>Eagle Hosp. Physicians, LLC v. SRG Consulting Inc.</u>, 561 F.3d 1298, 1307 (11th Cir. 2009).   But, the entry of a default by the Clerk does not necessarily require the Court to enter a default judgment.   <u>DIRECTV, Inc. v. Trawick</u>, 359 F. Supp. 2d 1204, 1206 (M.D. Ala. 2005).   Before the Court enters judgment pursuant to FED. R. CIV. P. 55(b) it must find that there is a sufficient basis in the pleadings to support the relief sought.   <u>Id.</u>   "The defendant is not held to admit facts that are not well-pleaded or to admit conclusions of law.   In short . . . a default is not treated as an absolute confession of the defendant of his liability and of the plaintiff's right to recover."   <u>Nishimatsu Constr. Co., Ltd. v. Houston Nat'l Bank</u>, 515 F.2d 1200, 1206 (5th Cir. 1975).[3]

## Count One

Count One of CFTC's complaint alleges futures and forex fraud based upon violations of the Act, Section 4b(a) and 2(A)-(C), 7 U.S.C. § 6b(a) and 2(A)-(C).   Section 4b(a)[4]  makes it illegal –

> (1) for any person, in or in connection with any order to make, or the making of, any contract of sale or any commodity in interstate commerce for future delivery that is made, or to be made, on or subject to the rules of a designated

---

[3]  In <u>Bonner v. City of Prichard</u>, 661 F.2d 1206, 1209 (11th Cir.1981) (en banc), the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit handed down before October 1, 1981.

[4]  Portions of the Act were amended in 2011. Defendants alleged acts occurred between 2009 and 2012, making both versions of the Act applicable to this case. The amendments to this Section and the amendments to Sections discussed below are not so substantive as to warrant separate discussion.

contract market, for or on behalf of anything other person; or

(2) for any person, in or in connection with any order to make, or the making of, any contract of sale of any commodity for future delivery, or swap, that is made, or to be made, for or on behalf of, or with, any other person, other than on or subject to the ruled of a designated contract market –

(A) to cheat of defraud or attempt to cheat or defraud the other person;

(B) willfully to make or cause to be made to the other person any false report or statement or willfully to enter or cause to be entered for the other person any false record;

(C) willfully to deceive or attempt to deceive the other person by any means whatsoever in regard to any order or contract or the disposition or execution of any order or contract, or in regard to any act or agency performed, with respect to any order of contract for or, in the case of paragraph (2), with the other person

The facts alleged by CFTC and admitted by AGP and Wilkins's defaults establish that these Defendants: (1) violated Section 4b(a) by misappropriating AGP Pool funds and by providing McKinley and Matterhorn pool participants with false account statements that misrepresented the profitability and value of their interests in the AGP Pools; (2) AGP and Wilkins engaged in these acts knowingly or with reckless disregard of the truth; (3) Wilkins was acting within the scope of his employment when he committed these acts; and (4) Wilkins controlled AGP with Leon and Rangle and did not act in good faith or knowingly induced, directly or indirectly, the acts constituting the violations. Misappropriation of customer funds constitutes "willful and blatant fraudulent activity" in violation of Section 4b(a)(2)(A) and (C) of the Act.   (Sup. III 2009); U.S. Commodity Futures Trading Com'n v. Machado, No. 11-22275-Civ, 2012 WL 2994396 *5 (S.D. Fla. Apr. 20, 2012) (collecting cases).   Making false statements to customers relating to forex

trades violates Section 4b(a)(2)(B) of the Act.   Id. (collecting cases).   Because Wilkins

was acting within the scope of his employment by AGP when he committed these acts,

liability is imputed to AGP.   Wilkins may in turn, be held liable for AGP's conduct

pursuant to § 13(b) of the Act, 7 U.S.C. § 13c(b).   These admitted facts meet the

requirements of the statutory language and are sufficient to establish that Wilkins and

AGP violated § 4b(a) of the Act.

## Count Two

Count Two of CFTC's complaint alleges fraud by a commodity pool operator and

associated persons in violation of Section 4o(1) of the Act, 7 U.S.C. § 6o(1). A commodity

pool operator is a person –

> (i)    engaged in a business that is of the nature of a
> commodity pool, investment trust, syndicate, or similar
> form of enterprise, and who, in connection therewith,
> solicits, accepts, or receives from others, funds . . . for
> the purpose of training in commodity interests,
> including any
>
> (I)    commodity for future deliver, security futures product,
> or swap
>
> (II)   agreement, contract, or transaction described in section
> 2(c)(2)(C)(i) of this title or section 2(c)(2)(D)(i) of this
> title;
>
> (III)  commodity option authorized under section 6c of this
> title.

Section 1a(11)(A)(i), 7 U.S.C. § 1a(11)(A)(i).

An associated person is "any natural person who is associated with a commodity

pool operator as a partner, officer, employee, consultant, or agent in any capacity which

involves the solicitation of funds, securities or property for participation in a commodity

pool or the supervision of any person or persons so engaged." 17 C.F.R. § 1.3(aa).

Section 4o of the Act, 7 U.S.C. § 6o, makes it unlawful for a commodity pool operator or an associated person by use of the mails or any means or instrumentality of interstate commerce –

> (A) to employ any device, scheme, or artifice to defraud any client or participant or prospective client or participant; or
>
> (B) to engage in any transaction, practice, or course of business which operates as a fraud or deceit upon any client or participant or prospective client or participant

CFTC has alleged that: (1) AGP operated as a commodity pool operator because it acted as an investment trust and solicited, accepted, or received funds, securities, or property from others for the purpose of trading futures, options, and forex; (2) Wilkins acted as an associated person because he was associated with AGP as a managing member and owner, and because he has been listed as a principal and registered with the NFA as the sole associated person of AGP since November 2009, and since 2010, the sole forex associated person of AGP; (3) Wilkins and AGP violated § 4o of the Act by misappropriating pool funds and by providing pool participants with false account statements that misrepresented the profitability of the Matterhorn and McKinley pools and the value of the participants' interest in each of those pools; (4) Wilkins and AGP engaged in these acts knowingly; and (5) that AGP is liable for Wilkins acts and vice versa.   (Docs. 91, 92).   These facts meet the requirements of the statutory language. See CFTC v. Smithers, No. 05-80592 CIV, 2006 WL 6355688 *6 (S.D. Fla. 2006) (stating that a defendant who knowingly misappropriates client funds or makes material misrepresentations and omissions to clients regarding futures transactions violates § 4o). Accordingly, I find CFTC has properly pled, and Wilkins and AGP are deemed to have admitted, that they violated § 4o.

**Count Three**

Count Three of the complaint alleges fraud in connection with off-exchange forex transactions in violation of Regulation 5.2(b)(1)-3), 17 C.F.R. § 5.2(b)(1)-(3), which makes it unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce, directly or indirectly, in or in connection with any retail forex transaction: (1) to cheat or defraud or attempt to cheat or defraud any person; (2) willfully to make or cause to be made to any person any false report or statement or cause to be entered for any person any false record; or (3) willfully to deceive or attempt to deceive any person whatsoever. The complaint avers that: (1) Wilkins and AGP engaged in this behavior by misappropriating AGP Pool funds and by providing pool participants with false account statements that misrepresented the profitability of the Matterhorn and McKinley pools and the value of the participants' interest in each of those pools; (2) Wilkins and AGP engaged in these acts knowingly; and (3) that AGP is liable for Wilkins acts and vice versa.   These averments of fact satisfy the requirements of the statutory language.   Based upon AGP and Wilkins' admission of these facts, I find that CFTC has established its claim that they violated Regulation 5.2(b)(1)-3, 17 C.F.R. § 5.2(b)(1)-(3).

**Count Four**

Count Four is an action for fraud in dealings with the NFA in violation of Section 9(a)(4) of the Act, 7 U.S.C. § 13(a)(4), which makes it unlawful for

> [a]ny person willfully to falsify, conceal, or cover up by any trick, scheme, or artifice a material fact, make any false fictitious, or fraudulent statements or representations, or make or use any false writing or document knowing the same to contain any false, fictitious, or fraudulent statement or entry to a registered entity, board of trade, swap data repository, or futures association designated or registered under this Act acting in furtherance of its official duties under this Act.

CFTC has alleged that: (1) the NFA is a futures association organized and registered pursuant to Section 17 of the Act, which was acting in furtherance of its official duties when it conducted an unannounced examination of AGP on June 14, 2012; and (2) AGP by and through Wilkins made numerous misrepresentations and provided false documents, including balance sheets and other documents that falsified the value of the AGP Pools to NFA during this examination.   These facts, which AGP and Wilkins are deemed to have admitted, are sufficient to prove CFTC's claim that these Defendants violated § 9(a)(4) of the Act.

## Permanent Injunction

Section 6c of the Act, 7 U.S.C. § 13a-1, provides in part that "[u]pon a proper showing, a permanent or temporary injunction or restraining order shall be granted without bond."   "In actions for a statutory injunction, the agency need not prove irreparable injury or the inadequacy of other remedies as required in private injunctive suites.   A prima facie case of illegality is sufficient."   CFTC v. Mulle, 570 F.2d 1296, 1399 (5th Cir. 1978).   CFTC may obtain injunctive relief upon a showing that Defendants violated the Act and that future violations may occur unless Defendants are enjoined. CFTC v. Sidoti, 178 F.3d 1132, 1137 (11th Cir. 1999).   Whether a likelihood of future violations exists depends on the totality of the circumstances.   CFTC v. Gutterman, No. 12-21047-CIV, 2012 WL 2413082 *7 (S.D. Fla. June 26, 2012) (quoting SEC v. Mgmt. Dynamics, Inc., 515 F.2d 801, 807 (2d Cir. 1975)).   A defendant's previous illegal conduct weighs heavily in this consideration.   Id.   The Court may also consider the following factors:

> [T]he egregiousness of the defendant's actions, the isolated or
> recurrent nature of the infraction, the degree of scienter

> involved, the sincerity of the defendant's assurances against
> future violations, the defendant's recognition of the wrongful
> nature of his conduct, and the likelihood that the defendant's
> occupation will present opportunities for future violations.

CFTC v. Wilshire Inv. Mngmt. Corp., 531 F.3d 1339, 1346 (11th Cir. 2008) (quoting SEC v. Carriba Air, Inc., 681 F.2d 1318, 1322 (11th Cir. 1982)).

CFTC has made a prima facie case that AGP and Wilkins acted illegally.   In addition, the Court has accepted Wilkins' guilty plea in which he admitted many of the same facts alleged by CFTC in this case.   See Case. No. 6:13-cr-181-22DAB.   Wilkins', and by extension AGP's, actions were egregious, resulting in victim losses of at least $16,805,047.81.   These actions occurred over the course of at least three years, and were not isolated in nature.   Additionally, CFTC has offered facts and evidence to support its claim that Wilkins and AGP acted with scienter.   (Doc. 94 at 20-21). Considering Wilkins' conduct on behalf of himself and AGP and the standards discussed above, I find that permanent injunctive relief is warranted.

### Disgorgement

"[T]he unqualified grant of statutory authority to issue an injunction under § 13a-1 carries with it the full range of equitable remedies, among which is the power to grant restitution."   Wilshire Inv., 531 at 1344.   The Eleventh Circuit defines disgorgement, or restitution, as "an equitable remedy designed to cure unjust enrichment of the defendant *absent consideration of the plaintiff's losses*."   Id. at 1345 (emphasis in original) (quoting Waldrop v. Southern Co. Services, Inc., 24 F.3d 152, 158 (11th Cir. 1994).   Courts have employed a basic calculation to determine how much the defendant unjustly benefited, subtracting the amount returned and the amount lost in trading from the amount taken. Gutterman, 2012 WL 2413082 *9.   AGP and Wilkins gained at least $17,999,633 in pool

participant contributions, returned approximately $1,170,034, and lost $5,859,756 in

trades.   Thus, the proper restitution for AGP to pay is $10,969,843.   Of this amount,

Wilkins improperly gained $1,214,902.   The Court has already ordered Leon and Rangel

to repay their respective unlawful gains.   (Docs. 91, 92).   Now, I recommend the Court

order AGP to pay restitution in the amount of $10,969,843 and order Wilkins to pay

restitution in the amount of $1,214,902.

Civil Monetary Remedy

Section 6c(d)(1) of the Act, 7 U.S.C. § 13a-1(d)(1), provides that "the [CTFC] may

seek and the court shall have jurisdiction to impose, on a proper showing, on any person

found in the action to have committed any violation [of the Act or Regulations] a civil

penalty."   The Act and Regulation 143.8(a)(1), 17 C.F.R, § 143.8(a)(1) provide that for

the period at issue, the civil monetary penalty should not be more than the greater of

$130,000 for each violation of the Act or triple the monetary gain.   However, the Court

need not impose the maximum penalty available under the Act.   CFTC v. Capital Blu

Mgmt., LLC, No. 6:09-cv-508-Orl-28DAB, 2011 WL 2357629 *7 (M.D. Fla. June 9, 2011).

The penalty must be "rationally related to the offence charged or the need for deterrence."

See CFTC v. Levy, 541 F.3d 1102, 1112 (11th Cir. 2008).   The Court should consider the

seriousness of the violation as well as any mitigating or aggravating circumstances.

Wilshire, Inv., 531 F.3d at 1346 (citing JCC, Inc. v. CFTC, 63 F.3d 1557, 1571 (11th Cir.

1995)).   Factors which inform the Court's determination include: "(1) the relationship of

the violation at issue to the regulatory purposes of the Act; (2) the defendant's state of

mind; (3) the consequences flowing from the violative conduct; and (4) the defendant's

post-violation conduct." CFTC v. Autry, No. 6:10-cv-84, 2011 WL 6400352 *6 (S.D. Ga.

Dec. 19, 2011) (inner brackets omitted)(quoting <u>R&W Technical Servs. Ltd. v. CFTC</u>, 205 F.3d 165, 177 (5th Cir. 2000)).

Wilkins knowingly engaged in fraud, a core violation of the Act.   <u>See</u> <u>Gutterman</u>, 2012 WL 2413082 *11.   His misconduct included knowingly misappropriating AGP Pool participants' funds and issuing false account statements.   His actions were sustained and repeated over at least a three year period, during which time he misled 240 pool participants.   And, he lied to the NFA to shield his and AGP's unlawful activity.   In these circumstances, I find that CFTC's request to penalize Wilkins in the amount of $3,644,706, which represents three times his gain, is appropriate.

### IV. Recommendation

Upon consideration of the foregoing, I respectfully recommend that the Court **GRANT** CFTC's Motion and Brief in Support of Motion for Entry of Default Judgment, Permanent Injunction, Civil Monetary Penalty and Ancillary Equitable Relief against Defendants Altamont Global Partners LLC and John G. Wilkins (Doc. 94) and enter an Order:

1. Permanently restraining, enjoining, and prohibiting Wilkins from directly or indirectly:

a. . cheating or defrauding, or attempting to cheat or defraud, other persons in or in connection with any order to make, or the making of, any contract of sale of any commodity for future delivery or any forex contract (as described in Sections 2(c)(2)(B) and 2(c)(2)(C)(i) of the Act, 7 U.S.C. § 2(c)(2)(B) and 2(c)(2)(C)(i)) (2012) (forex contract) that is made, or to be made, for or on behalf of, or with, any other person in violation of Section 4b of the Act, 7 U.S.C. § 6b (2012);

b. . employing any device, scheme or artifice to defraud any participant or prospective participant or engaging in any transaction, practice, or course of business which operates as a fraud or deceit upon any client or participant or prospective participant in violation of Section 4Q( 1) of the Act, 7 U .S.C. § 6Q( 1) (2012);

c.. cheating or defrauding, or attempting to cheat or defraud, other persons, or willfully to make or cause to be made to any person any false report or statement or cause to be entered for any person any false record, or willfully to deceive or attempt to deceive any person whatsoever in or in connection with any retail forex transaction in violation of Regulation 5.2(b)(I )-(3), 17 C.F.R. § 5.2(b)( I )-(3) (2013);

d.. trading on or subject to the rules of any registered entity (as that term is defined in Section Ia of the Act, 7 U.S.C. § I a (2012));

e. entering into any transactions involving commodity futures, options on commodity futures, commodity options (as that term is defined in Regulation 1.3 (hh), 17 C.F.R; § I.3(hh) (2013)) ("commodity options"), swaps (as that term is defined in Section Ia(47) of the Act, 7 U.S.C. § Ia(47) (Supp. V 201 1), and as further defined by Commission Regulation I.3(xxx), 17 C.F.R. § 1.3 (xxx) (2012)) ("swaps"), security futures products, and/or forex contracts for his own personal account or for any account in which he has a direct or indirect interest;

f. having any commodity futures, options on commodity futures, commodity options, swaps, security futures products, and/or forex contracts traded on his behalf;

g. controlling or directing the trading for or on behalf of any other person or entity, whether by power of attorney or otherwise, in any account involving commodity

futures, options on commodity futures, commodity options, swaps, security futures products, and/or forex contracts;

h. soliciting, receiving or accepting any funds from any person for the purpose of purchasing or selling any commodity futures, options on commodity futures, commodity options, swaps, security futures products, and/or forex contracts

i. applying for registration or claiming exemption from registration with the CFTC in any capacity, and engaging in any activity requiring such registration or exemption from registration with the CFTC, except as provided for in Regulation 4.14(a)(9), 17 C.F.R. § 4.14(a)(9) (2013); and/or

j. acting as a principal (as that term is defined in Regulation 3.1(a), 17 C.F.R. § 3.1(a) (2013)), agent or any other officer or employee of any person (as that term is defined in Section la of the Act, 7 U.S.C. § la) registered, exempted from registration or required to be registered with the CFTC except as provided for in Regulation 4.14(a)(9), 17 C.F.R. § 4.14(a)(9) (2013).

2. Directing AGP to disgorge and pay $10,969,843 and order Wilkins to disgorge and pay $1,214,902.  Pursuant to the Court's Orders dated October 2 and 15, 2012, the Court appointed Mark V. Silverio as Receiver for the Receivership Entities.  Consistent with the power granted by the Court, the Receiver has taken possession of and/or liquidated numerous assets of the Receivership Entities, including assets in the name of or otherwise attributable to the Receivership Entities.  The funds derived from the sale or liquidation-now or in the future-of AGP and Wilkins assets in receivership, along with any interest earned on these funds, will be returned to defrauded customers (less any court-approved fees and expenses incurred or to be incurred by the

Receiver), and shall be used to satisfy, in full or in part, AGP and Wilkins' disgorgement obligations.   The Court should order that these funds be distributed to defrauded customers by the Receiver pursuant to and consistent with a distribution plan approved by the Court and that AGP and Wilkins' rights, if any, to these funds and/or the underlying assets be extinguished (except as may be necessary for the Receiver to carry out his duties).

3. Directing AGP pay $10,969,843 and that Wilkins pay the $1,214,902, plus post-judgment interest.   Post-judgment interest shall accrue beginning on the date of entry of the Court's Order and shall be determined by using the Treasury Bill rate prevailing on the date of entry of the Order pursuant to 28 U.S.C. § 1961.   AGP and Wilkins' obligations shall be satisfied from the assets they held or hold, now or in the future, by the Receiver.   To the extent the Receiver's sale or liquidation of AGP and Wilkins' assets is insufficient to satisfy their obligations, AGP and Wilkins shall be responsible for the short fall.

4. Directing AGP and Wilkins to make payments to the Receiver in the name "AGP Fund" and shall send such payments to: Mark V. Silverio, Silverio & Hall, P.A., 255 Eighth Street South, Naples, Florida 34102-6123, under cover letter that identifies the paying Defendant and the name and docket number of this proceeding.   AGP and Wilkins shall simultaneously transmit copies of the cover letter and the form of payment to the Chief Financial Officer, Commodity Futures Trading Commission, Three Lafayette Centre, 1155 21st Street, NW, Washington, D.C. 20581.

5. Directing any financial institution holding AGP or Wilkins' funds to liquidate and release all funds, whether the funds are held in a single or joint account, or in any other

capacity, and to convey by wire transfer to an account designated by the Receiver, all funds in these accounts, less any amounts required to cover the financial institutions' outstanding administrative or wire transfer fees, within thirty (30) days of receiving a copy of the Court's Order. At no time during the liquidation, release, and/or wire transfer of these funds pursuant to this Order shall AGP or Wilkins be afforded any access to, or be provided with, any funds from these accounts. AGP and Wilkins and all banks and financial institutions subject to this Order shall cooperate fully and expeditiously with the CFTC and the Receiver in the liquidation, release, and wire of these funds.

6. Appointing NFA as Monitor to effect payment of AGP and Wilkins remaining disgorgement obligations after the termination of the receivership (to the extent such disgorgement obligations have not already been satisfied) and to effectuate the distribution of any disgorgement paid by AGP and Wilkins after the termination of the Receiver's duties, to be effective immediately upon any order entered by this Court terminating the Receiver's duties.

7. Directing the Monitor to collect disgorgement payments from AGP and Wilkins and make distributions as set forth below. Because the Monitor is acting as an officer of the Court in performing these services, the NFA shall not be liable for any action or inaction arising from NFA's appointment as Monitor, other than actions involving fraud.

8. Directing AGP and Wilkins, o the extent their disgorgement obligations have not already been satisfied upon termination of the receivership, to make any remaining disgorgement payments to the Monitor in the name of "AGP Fund" and send such payments to the Office of Administration, National Futures Association, 300 South

Riverside Plaza, Suite 1800, Chicago, Illinois 60606 under cover of a letter that identifies the payer, the case name, docket number, and the name of this Court.   AGP and Wilkins shall simultaneously transmit copies of their cover letters and form of payment to: (a) the Director, Division of Enforcement, Commodity Futures Trading Commission, Three Lafayette Centre, 1155 21st Street, NW, Washington, D.C. 20581 ; and (b) Charles Marvine, Chief Trial Attorney, Division of Enforcement, Commodity Futures Trading Commission, 4900 Main Street, Suite 500, Kansas City, MO 64112.

     9. Directing the Monitor to distribute any funds collected to the defrauded customers identified by the Receiver in an equitable manner that is consistent with the distribution plan ultimately approved by this Court.   The Monitor shall oversee the distribution of funds from the disgorgement payments by AGP and Wilkins and shall have the discretion to defer distribution until such time as it may deem appropriate.   In the event that the amount of disgorgement payments made to the Monitor by AGP or Wilkins are of a de minimis nature, such that the Monitor determines that the administrative costs of making a distribution to defrauded customers is impractical, the Monitor may, in its discretion, treat such disgorgement payments as civil monetary penalty payments, which the Monitor shall forward to the CFTC following the instructions for the civil monetary penalty obligation set forth below.

     10. Stating that the amounts payable to each pool participant shall not limit the ability of any pool participant to prove that a greater amount is owed from AGP, Willkins, or any other person or entity, and nothing herein shall be construed in any way to limit or abridge the rights of any pool participants that exist under state or common law.

11. Stating that, pursuant to Rule 71 of the Federal Rules of Civil Procedure, each pool participant of the Receivership Entities who suffered a loss is explicitly made an intended third-party beneficiary of this Order and may seek to enforce obedience of this Order to obtain satisfaction of any portion of AGP or Wilkins' disgorgement obligations that have not been paid by the extent that any funds accrue to the U.S. Treasury for satisfaction of their disgorgement obligations.   Such funds shall be transferred to the Receiver and/or Monitor, as appropriate, for disbursement in accordance with the procedures set forth above.

12. Directing Wilkins to pay a civil monetary penalty in the amount of $3,644,706, plus post-judgment interest.   Post-judgment interest shall accrue on this penalty beginning on the date of entry of the Order and shall be determined by using the Treasury Bill rate prevailing on the date of entry of the Order pursuant to 28 U.S.C. § 1961 (2006).

13. Directing Wilkins to pay his civil monetary penalty to the CFTC at the address below:

> Commodity Futures Trading
> Commission Division of Enforcement
> ATTN: Accounts Receivables-AMZ
> 340 E-mail Box:  9-AMC-AMZ-AR-
> CFTC DOT/FAA/MMAC
> 6500 S. MacArthur Blvd.
> Oklahoma City, OK 73169
> Telephone: (405) 954-5644

14. Directing Wilkins to accompany his payment with a cover letter that identifies him and the name and docket number of this proceeding.   Wilkins shall simultaneously transfer copies of the cover letter and the form of payment to the Chief Financial Officer,

Commodity Futures Trading Commission, Three Lafayette Centre, 1155 21st Street, NW, Washington, D.C. 20581.

     15. Stating that any acceptance by the CFTC or Receiver of partial payment of Wilkins' disgorgement obligation, or civil monetary penalty shall not be deemed a waiver of his obligation to make further payments pursuant to this Order, or a waiver of the CFTC's right to seek to compel payment of any remaining balance.

     Specific written objections may be filed in accordance with 28 U.S.C. § 636, and M.D.Fla.R. 6.02, within fourteen (14) days after service of this report and recommendations.   Failure to file timely objections shall bar the party from a de novo determination by a district judge and from attacking factual findings on appeal.

     **RESPECTFULLY RECOMMENDED** in Orlando, Florida on January 31, 2014.

THOMAS B. SMITH
United States Magistrate Judge

Copies furnished to:

     Presiding United States District Judge
     Counsel of Record
     Any Unrepresented Parties